IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

_____

CARLOS PEDRO INZUNZA, PRO SE,  §
also known as                  §
ANTONIO SICAIROS FELIX,        §
TDCJ-CID No. 755454            §
                               §
        Plaintiff,             §
                               §
v.                             §    2:09-CV-0048
                               §
DAVID MOORE,                   §
    Chaplain W. P. Clements Unit, §
BILL PIERCE,                   §
    Director of Chaplaincy Dept., and §
NATHANIEL QUARTERMAN,          §
    TDCJ Director,             §
                               §
        Defendants.            §

**MEMORANDUM OPINION AND ORDER OF DISMISSAL WITH
FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Plaintiff is an inmate incarcerated in the Texas Department of Criminal Justice,

Institutional Division (TDCJ-ID), and has filed this lawsuit claiming violations of his rights

under both the Religious Land Use and Institutionalized Persons Act (RLUIPA) and 42 U.S.C.

§ 1983. Plaintiff alleges Defendants do not allow "the House of Yahweh inmates to congregate

at the chapel[1] on a Saturday between the hours of 7 a.m. and 3 p.m. to worship and congregate

for a period of one hour." Plaintiff further alleges Defendants allow Muslims to meet without an

officer or volunteer present, but he is not given the same right to meet with other offenders who

have designated the House of Yahweh as their faith. Plaintiff claims this violates his right to

Equal Protection.

Plaintiff only seeks injunctive relief.

The parties consented to trial before the Magistrate Judge; and a bench trial was

conducted on June 22, 2010. At the trial, plaintiff Inzunza; defendant Moore, Clements Unit

_____

[1]At trial, plaintiff clarified that the requested congregate service would not need to be in the chapel, but could occur in any of the multi-purpose rooms. In a post-trial submission, however, plaintiff stated he was asking to be allowed to congregate in the chapel, and the Court considers his request for relief in his complaint and in the pretrial order to be an accurate statement of the relief he requests.

Chaplain; Rory Murphy, Chaplain III of TDCJ Region V; defendant Bill Pierce, the Director of Chaplaincy Operations for TDCJ; and Warden John Adams, Senior Warden at the Clements Unit, all were sworn and testified. That testimony is summarized below.

Plaintiff offered testimony that his understanding of his faith is that they teach and follow the 316 laws of the Bible. Plaintiff wishes to congregate on Saturday with others of his faith in accordance with law #154 found in the Book of Exodus. Plaintiff stated there were 14 laws that prohibit members of the House of Yahweh from worshiping with persons of other faiths and listening to false teachings. Plaintiff says other religions are false and worship Satan or other demons; but in his religion, Yahweh is worshiped. He stated that he must congregate with other members of his religion, and not with people who worship false gods, on every day of rest, *i.e.*, each Saturday. While plaintiff said he objects to the designation of the Deity as "God" and worships only "Yahweh" because "God" is a name of "Satan" or some other demon, plaintiff said the laws of the Old Testament form the basis of his religious observance and that their study is important or even central to his faith. Further, plaintiff objects to being called a "Christian."

Defendant Chaplain Moore testified the vast majority of the inmate population is Christian, non-Roman Catholic, (CNRC) such as Baptists, Lutherans, Methodists, Church of Christ, etc. He stated the Chapel is in One Building and has a capacity of forty people. Although denominated a chapel, it is just like any other multipurpose room in the unit and is not used exclusively as a chapel, but is also used as a multipurpose room as well. Chaplain Moore testified religious services were held in various multipurpose rooms throughout the unit because the chapel couldn't accommodate everyone (groups over 40) and that some services, like those in Eighteen and Nineteen Buildings, are even held in the building gyms. He said the building chaplains (free world volunteers) are interviewed to determine they will not be so "doctrinaire" as to exclude inmates from their services and that these are open-call services which any inmate may attend. Chaplain Moore stated the Saturday events are scheduled on that day because volunteers are available for those days. He further explained that, although Roman Catholics

believe the Sabbath day is on Sunday, their primary worship service is on Thursday evenings because that is when volunteers are available to lead them. He stated their services are not in the Chapel but are split up among the buildings where the inmates are housed.

Chaplain Moore testified non-Roman Catholic Christians who are Sabbatarians have a weekly Saturday worship service in the chapel. He said the service was conducted by Archie Hunnicutt, a Messianic Jew, who was an approved volunteer and who taught primarily from the Old Testament.

Defendant Chaplain Moore's unchallenged testimony was that the laws to which plaintiff referred were the 613[2] laws set forth in the Old Testament. He said a notice was sent to all non-Roman Catholic Christian Sabbatarians that the service was open to them, but no response was received from plaintiff or any member of the House of Yahweh. He stated that, while the service was presently held in the Chapel, if the number of attendees became too large for the chapel, the group would have to be broken up and services would be held in each Building with a volunteer.

Defendant Chaplain Moore further testified there were about 283 Muslims at Clements, or 7.8% of the inmate population, comprised of several different sects, including Sunni, Shi'ite, and NOI. He stated they worship together in generic Muslim services in four or five groups which meet in several Buildings because there were too many of them to meet in the Chapel. Chaplain Moore testified Muslim inmates act as coordinators at services if no Muslim chaplain is available but that the services and the inmates are under visual and audio supervision at all times and the services are audio taped. He said TDCJ has five or six Muslim chaplains; that the chaplain for this district is responsible for at least ten units; and that he can make it to only one or two units on any single afternoon.

Defendant Chaplain Moore testified that, if a House of Yahweh clergyman wanted to lead services at the prison, he would be interviewed to determine whether he's a security threat, is properly credentialed by the House of Yahweh, and would conduct services in accord with the

---

[2]The Court notes the discrepancy in the number of laws as testified to by plaintiff and by Chaplain Moore, but only concludes one or the other mis-spoke.

House of Yahweh. He testified that, when out of their cells, inmates can gather together and discuss their faiths. Further, he testified that clergy can meet with inmates on a ministerial visit twice a month. Chaplain Moore explained that certain services were often conducted in the evening so they wouldn't interfere with inmate work schedules. He added that staff didn't have time to schedule separate services for each faith sub-group in the Christian non-Roman Catholic faith group and that the task would be a "practical nightmare."

On cross-examination by plaintiff, defendant Chaplain Moore stated that Jehovah's Witnesses meet in services solely for Jehovah's Witnesses on the first and third Saturday of each month and have two volunteers to conduct those services.

Chaplain Moore agreed that no members of the House of Yahweh attend the Christian non-Roman Catholic Sabbatarian services and testified there is no approved House of Yahweh volunteer for the Clements Unit. In fact, he stated, the nearest free world House of Yahweh group is located in Abilene, Texas, where the religion was founded.

Chaplain Moore testified that, if there were an approved House of Yahweh volunteer available and ten to twenty-five House of Yahweh inmates wanted to attend services, he would examine House of Yahweh beliefs to determine whether there is a distinction between the House of Yahweh and Christian non-Roman Catholics Sabbatarians. He stated that, if the unit had to accommodate the House of Yahweh services, something presently on the schedule would have to be removed. He further stated that House of Yahweh members could not meet with an inmate coordinator instead of an outside volunteer like the Muslims because prison policy requires an approved volunteer.

Rory Murphy, Chaplain III of TDCJ Region V, testified he has worked for the prison system for twenty-two years and presently supervises the chaplains at seventeen units. He stated he has handled requests for separate services from inmates adhering to a variety of faiths, including Buddhists, Wiccans, Odinists, etc. Chaplain Murphy stated Mormons meet in a separate service because they are recognized as not being part of the Protestant faiths. He stated

that all of the Christian non-Roman Catholic faiths have the same major tenets but have differences on minor issues. He further stated that Catholics and most Protestants use the word "God" when referring to the Deity. He said Christian non-Roman Catholic Sabbatarians celebrate more of the Old Testament or Jewish holy days such as Passover, but that different sects have different dates for those holy days.

Chaplain Murphy testified that to determine whether to hold a separate service for the House of Yahweh, officials would also have to consider time, space, and security. He stated an outside volunteer would be required and that it would violate prison policy to have plaintiff lead services. He said an outside volunteer was necessary to ensure the integrity of the service so that what occurred and was being taught comported with services and teachings in the free world.

Regarding Muslims, Chaplain Murphy stated the five Muslim chaplains interview inmates and select offenders who are sufficiently knowledgeable and can conduct Muslim services. He stated the Muslim chaplain ensured the inmate had sufficient knowledge of Islam and knew how to lead the prayers. He said that he, personally, wouldn't know if a Muslim service was being done correctly.

Regarding the House of Yahweh, Chaplain Murphy testified he didn't know of any House of Yahweh in Amarillo and that their main facility is outside Abilene, Texas.

Regarding Jewish inmates, Chaplain Murphy testified that, in this region, there is a gabbi, a Jewish clergyman under the supervision of a rabbi, who is an approved volunteer and who comes once a month to one unit and ministers to the inmates.

Defendant Bill Pierce, the Director of Chaplaincy Operations for TDCJ, testified he oversees the regional chaplains and supervises the writing of policies and procedures. He said TDCJ has had to deal with requests from Wiccans, Odinists, Buddhists, Native Americans, and Jewish inmates, as well as others. He stated TDCJ requires religious oversight from volunteers outside the prison, in part, because of a policy that offenders are not placed in authority over one another. Further, inmate complaints concerning dissatisfaction with any particular service would

be resolved in consultation or with reference to free world practices in that faith group.  He said there was only one House of Yahweh congregation in Texas.

Defendant Pierce testified TDCJ has over ninety Christian faith groups, with many variations in beliefs.  For instance, some Baptists feel they can't worship with other Baptists.  Nevertheless, he said, TDCJ tries to provide generic services which will give each inmate something of benefit.

Defendant Pierce further testified that, when there's a general call-out to religious services, there is a problem with gangs meeting during church.  He stated the volunteers provide the security during the services and that, if an inmate were conducting the service without a volunteer, it would be easier for a gang to infiltrate.  He said the particular religion did not indicate whether there would be gang problems.

Lastly, Warden John Adams testified he was the Senior Warden at the Clements Unit, had worked for TDCJ for twenty-eight years, and had worked his way up through the ranks, having worked on ten units during his career.  Warden Adams testified that even if an inmate is not a disciplinary problem, other gang inmates could infiltrate a service and use it as an opportunity to pass on gang information.  He stated that a lot of gang members have clean disciplinary records even though they may actually be running the gangs.

Warden Adams said Muslims are allowed to meet without an outside volunteer because of a court case[3], but that there is an officer who observes and listens at all times.  He said if plaintiff's request for a service without a volunteer were accommodated, TDCJ would have to provide extra security and that it didn't have sufficient personnel or space for all faith groups.  He said it would present a logistical nightmare.

Warden Adams testified most services are by open call-out.  He said if a service is held in the chapel, it must be by lay-in.  A lay-in requires the chaplain to make out the lay-in lists from which personnel must print and pass out the lay-ins.  Other personnel must then verify the lay-

---

[3]The Court takes judicial notice of *Brown v. Beto*, 4:74-CV-0069 (S.D.Tex.1977).

ins and conduct the necessary searches of inmates when the lay-ins are presented by inmates to go to the chapel. He stated there was nothing in the chapel which was different from any other multipurpose room on the unit except a small removable cross. He said its maximum occupancy was forty.

Upon further examination, Warden Adams stated most of the services are clustered in the buildings where the inmates are housed based upon their classification. He stated the chapel was the only place where all of the House of Yahweh inmates could be assembled together.

On rebuttal, plaintiff Inzunza testified he did not know of any free world member of the House of Yahweh who was available and/or would volunteer to come to the Clements Unit to conduct services, although he had not attempted to write to the House of Yahweh in Abilene and ask if anyone would volunteer or if they could help him find someone. He said he guessed they could look for someone and testified he thought that, "little by little" they would be able to find someone. Plaintiff also stated he presently practices his religion by congregating with other House of Yahweh inmates in the recreation yard outside or in the dayroom. He said that, when alone, he read and prayed in his cubicle and, when outside, he met with other House of Yahweh inmates but was not allowed to bring his Bible outside. Plaintiff also stated he received magazines and newsletters from the House of Yahweh and kept his religious material in his cell. He said the inability to congregate with other House of Yahweh inmates kept them from learning about the Bible and that there are people who are not registered as House of Yahweh who would like to learn.

In support of judgment, the Court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1.      Plaintiff, Carlos Pedro Inzunza, was an inmate at the Clements Unit of the Texas Department of Criminal Justice at all times relevant to this lawsuit.

2. Defendants Moore and Pierce were, at all times relevant to this lawsuit, employees of TDCJ. Former Defendant Quarterman is no longer employed by TDCJ, and his position is now held by Defendant Thaler.

3. On April 16, 2008, at plaintiff's request, his faith preference was changed by prison officials to the House of Yahweh.

4. TDCJ's religious accommodation policy draws a distinction between major faith groups and faith sub-groups. Congregate services are conducted for members of major faith groups if a chaplain or an outside volunteer is available to conduct the service. Congregate services are not conducted exclusively for inmate members of a faith sub-group. Congregate services are conducted for members of the House of Latter Day Saints, or Mormons, and for Jehovah's Witnesses because they are not considered to be Protestant or Catholic and have free world volunteers to lead the services. The sole exception to the outside volunteer rule is that, as a result of *Brown v. Beto*, 4:74-CV-0069 (S.D.Tex. 1977), Muslim inmates are allowed to meet without a chaplain or outside volunteer and their services may be led by an approved inmate coordinator.

5. Approved inmate coordinators for Muslim services are inmates who have been interviewed by one of the 5 or 6 Muslim chaplains employed by TDCJ to ensure they have a proper knowledge base to enable them to coordinate Muslim services. This is a task performed only by Muslim chaplains and not by chaplains of other faith groups. The Muslim chaplains must also perform other tasks and assume responsibilities which chaplains of other faith groups do not perform, such as resolving disputes that arise among inmates with respect to the inmate coordinators and the services they conduct. In addition, Muslim services conducted by inmate coordinators are audio taped and are under audio and visual supervision by security staff. Thus, Muslims are handled differently than other faith groups.

6. There are no congregate services conducted exclusively for inmate members of the House of Yahweh, although a weekly meeting of Christian non-Roman Catholic Sabbatarians is conducted on Saturdays and is open to plaintiff and other House of Yahweh inmates. Plaintiff and

other House of Yahweh inmates choose not to attend those services as plaintiff feels it would violate their faith.

7. At present, there is no approved outside volunteer to conduct House of Yahweh services for inmates at the Clements Unit.

8. A request from plaintiff's religious sub-group, the House of Yahweh, for separate services would be given consideration if there was a free world volunteer available to lead such services. Such consideration would include whether there is a distinction between the Christian Non-Roman Catholic Sabbatarian beliefs and practices and those of the House of Yahweh to determine whether plaintiff's sub-group is sufficiently different.

9. Neither plaintiff nor prison officials know of anyone who would volunteer to lead House of Yahweh services at the Clements Unit. There is no House of Yahweh congregation in Amarillo, and the closest one is near Abilene, Texas, and is the only House of Yahweh congregation in the entire state. Plaintiff has made no attempt to find a non-inmate House of Yahweh follower to act as an outside volunteer to lead House of Yahweh services.

10. In addition to the weekly Christian non-Roman Catholic services, plaintiff can also meet with other House of Yahweh inmates on the recreation yard and in the dayroom. They are allowed to discuss their religion at such times, but they are not allowed to bring their Bibles into the recreation yard or the dayroom.

11. Plaintiff is permitted to receive religious literature and is allowed to keep his religious material in his cell or cubicle, where he may study and pray when alone.

12. Congregate services for the various major faith groups are not usually conducted in the chapel, but are instead conducted in the buildings where inmates are housed, utilizing the multipurpose rooms of those buildings or, when attendance will be especially large, the gymnasiums of those buildings.

13. Since inmates are assigned housing according to their classifications, a House of Yahweh meeting in a single building would not include all House of Yahweh inmates at Clements,

and the number of House of Yahweh inmates would not support services in each of the buildings where they are housed. The only place all House of Yahweh inmates on the unit could congregate at the same time would be the multipurpose room in One Building, *i.e.*, the chapel.

14. The chapel is not a sanctuary-type room but is like any other multipurpose room in the prison except that it contains a small, removable cross and is in the area where the chaplains' offices are located. It can accommodate up to forty people in compliance with the fire code.

15. Services conducted in the chapel are not by general call-out, as are the services conducted within the confines of each building. Chapel services require the inmates be allowed to leave their separate assigned housing buildings and go to One Building, where the chapel and most of the administrative offices are located. Inmate travel to the chapel is only by lay-in, with a lay-in pass generated for and issued to each inmate attendee who wishes to attend and receives approval. This requires someone (a chaplain or an inmate coordinator) to prepare a lay-in list and requires TDCJ staff to prepare, verify, and distribute the lay-in passes. It further requires security staff to search the inmates at a minimum of two security checkpoints when they travel from their housing building to One Building.

16. Prison policy requires the presence of an outside volunteer to conduct congregate worship unless the faith group is Muslim. Muslims are excepted because of the consent decree in *Brown v. Beto*, 4:74-CV-0069 (S.D.Tex.1977). The prison must provide additional personnel to ensure security and order at Muslim congregate worship. This is done by ensuring a guard is present who can both view and hear everything going on the entire time. Further, each Muslim service is audio recorded.

17. If an inmate were allowed to "coordinate" services for House of Yahweh inmates, in addition to the security and staffing concerns involved in the travel of inmates to the One Building multi-purpose room/chapel, conducting a service there or anywhere else without an approved volunteer would necessitate the providing of audio tape equipment and the assignment of one or more guards to ensure security and discipline during the service, as is done with Muslim services.

Further, such would also require approval of an inmate coordinator by someone qualified to judge the inmate's knowledge of that faith and ability to coordinate the service.

18.     Prison officials have no one who is qualified to interview inmate members of the House of Yahweh to determine their knowledge base in the beliefs of the House of Yahweh and to ensure that meetings or services conducted by an inmate comply with free world standards, as is done with Muslim inmate coordinators.

19.     As shown in Defendants' Exhibit 1, as of March 31, 2010, there were 3,631 inmates at the Clements Unit. Of that number, 1,949 (53.7% of the offender population) were Christian/non-Roman Catholic, 692 (19.1% of the offender population) were Roman Catholic, and 16 (0.4% of offender population) were House of Yahweh. There were a total of 283 offenders (7.8% of offender population) adhering to what are considered Muslim/Islamic faiths. (Defendants' Exhibit 1).

20.     Saturday services for Christian/non-Roman Catholic Sabbatarians have been held monthly beginning December 5, 2009. Weekly services began May 1, 2010. The services last approximately two hours. Those services are conducted by an approved volunteer. Offenders of various designated faith groups have attended the Saturday services, including Messianic Jews and Assembly of Yahweh (which is different from the House of Yahweh). Testimony from Chaplain Moore and Exhibit 4 received at trial shows the services consist primarily of readings from the Old Testament and the Torah and teachings concerning Old Testament laws and Hebrew words. These services are held in the chapel. Members of the House of Yahweh may attend, but inmates of other faiths are not excluded and the services are not limited to only members of the House of Yahweh. Members of the House of Yahweh have chosen not to attend.

21.     There are numerous Christian/non-Roman Catholic faith groups which recognize Saturday as the Sabbath. However, all are required to meet together for a generic service, and no sub-group, including House of Yahweh, is presently provided separate services. This is the same practice followed for the other major faith groups. For instance, all Muslims attend a generic Muslim service and non-Sabbatarian Protestants attend a generic Protestant service.

22.     Plaintiff Inzunza was advised in writing about the Saturday services, but failed to respond.  Inzunza is classified as a GP2 offender, and is eligible to attend the services.

23.     Approved volunteer Archie Hunnicutt is the Director of Ministries for Mayim Hayim Ministries.  Mr. Hunnicutt is the volunteer primarily responsible for conducting the Saturday services.

24.     TDCJ has experienced expanding numbers of requests for accommodations and lawsuits by various religious groups and sub-groups desiring to meet exclusively with members of their own particular faith group or sub-group and to expand the scope of privileges in connection with the practice of various faiths.

25.     There are currently in excess of 250 different designated faith preferences/codes for offenders in TDCJ and considerations of space, time, budget, personnel and security prohibit prison officials from providing a separate service exclusive to each faith preference.

26.     TDCJ has a compelling interest in providing a safe and secure facility for both inmates and staff.  TDCJ has staffing, space and budgetary limitations which affect decisions regarding which programs are to be made available to inmates.

## CONCLUSIONS OF LAW

1.      Pursuant to FED. R. CIV. P. 25 (d)(1), Defendant Thaler is automatically substituted for Nathaniel Quarterman, as the plaintiff seeks injunctive relief against defendants in their official capacities.

### RLUIPA

2.      The Religious Land Use and Institutionalized Persons Act, RLUIPA, provides that no government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that compelling governmental interest.  42 U.S.C. § 2000c-1(a)(1)-(2).

3.          Plaintiff submits he cannot congregate with members of other religions because members of the House of Yahweh believe that is forbidden by 14 laws of the Bible and because other religions worship Satan or some other demon under the name of God or Lord.  Thus, he says, the weekly Christian non-Roman Catholic Sabbatarian services will not meet his religious needs. Plaintiff, however, has never attended any of the Christian non-Roman Catholic Sabbatarian services which are available and has offered no testimony concerning what actually occurs in those services or whether the teachings actually propounded therein are in conflict with his own sub-faith.  In addition, despite his testimony that he receives various religious newsletters and magazines from the House of Yahweh and keeps religious literature in his cell, plaintiff has offered only his testimony of religious exclusivity to support his claim that the weekly Christian non-Roman Catholic Sabbatarian services will not meet his religious needs as a member of the House of Yahweh.  Unlike the inmate in *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 323-333 (5th Cir. 2009), plaintiff does not allege this claim of religious exclusivity is simply one of his own personal belief.  Instead, he contends it is a tenet of the faith of which he is a member.  While it is a close issue, the Court finds plaintiff has not met his burden to show the existence of a substantial burden on his religious exercise.  *Accord, Jones v. Shabazz*,    910, No. 08-20697, 2009 WL 3682569 (5th Cir. Nov. 5, 2009)(inmate's self-serving affidavit that his religious beliefs as member of NOI forbade his consumption of anything but fresh fruits, vegetables, chicken and fish was insufficient to support claim for violation of rights under RLUIPA or First Amendment).  To find otherwise, would be to allow each inmate asserting a naked claim of religious exclusivity regarding a religion or practice shared with others, and not solely that of the inmate, to be deemed to have established that point. Therefore, if plaintiff has not made the necessary showing of religious exclusivity, then the opportunities presently afforded him are clearly adequate and there is no substantial burden on his religious practice.

4.     Alternatively, even if plaintiff is deemed to have sustained his burden on his claim of religious exclusivity, plaintiff has failed to show TDCJ has imposed a substantial burden on his religious exercise.

5.     In addition to the weekly Christian non-Roman Catholic Sabbatarian services, plaintiff and other members of the House of Yahweh are permitted to assemble and meet informally and exclusively with other members of the House of Yahweh on the recreation yard and in the dayroom to discuss their religion and pray, albeit without their Bibles.  Nothing prevents inmate members of the House of Yahweh from agreeing on a Bible verse or a particular scripture to be discussed the next day and reviewing it the day before in preparation for that discussion.  Plaintiff may also congregate with other members of the House of Yahweh along with other Christian non-Roman Catholic Sabbatarians on a weekly basis to study the Old Testament.

6.     Defendants have demonstrated that the generic structure of the Christian non-Roman Catholic Sabbatarian services, while not including everything plaintiff would experience at a free world service, would be devoted primarily to a study of the Old Testament.

7.     The circumstances of this case are similar to those presented in *Jones v. Shabazz*, 2007 WL 2873042, Civil Action No. H-06-1119, September 28, 2007 (S.D. Tex.), where the inmate plaintiff contended RLUIPA required TDCJ to accommodate NOI adherents with respect to their unique religious practices because it is mandatory that NOI adherents study the teachings of their leaders at the Jumah and Taleem services.  The Fifth Circuit affirmed the district court's determination that, in light of the generic Muslim services offered, plaintiff had not met his burden of showing a substantial burden on his free exercise of religion.  *Jones v. Shabazz*, 352 Fed.Appx. 910, no. 08-20697 2009 WL 3682569 (Nov. 5, 2009 C.A.5 (Tex.)).

8.     The Christian non-Roman Catholic Sabbatarian services offer plaintiff and other members of the House of Yahweh a chance to increase their understanding of the Old Testament and thus, to grow spiritually.  This congregate service is clearly structured to provide what all members

of that major faith group hold in common, study of the Old Testament. While it does not provide an experience in accord with some traditions specific to plaintiff's sub-group, the other methods of worship available to plaintiff are adequate at least to the extent the TDCJ policy does not impose a substantial burden.

### FREE WORLD VOLUNTEER POLICY

9.      If, however, upon review, plaintiff is deemed to have sustained his burden of proof on both exclusivity and on the imposition of a substantial burden due to no accommodation for exclusive House of Yahweh congregate services, then the Court notes that, in *Adkins v. Kaspar*, 393 F.3d 559 (5th Cir. 2004), the Fifth Circuit held that "the effect of a government action or regulation is significant when it either (1) influences the adherent to act in a way that violates his religious beliefs, or (2) forces the adherent to choose between, on the one hand, enjoying some generally available, non-trivial benefit, and, on the other hand, following his religious beliefs. A government action or regulation does not rise to the level of a substantial burden on religious exercise if it merely prevents the adherent from either enjoying some benefit that is not otherwise generally available or acting in a way that is not otherwise generally allowed." *Adkins v. Kaspar,* 393 F.3d 559, 571 (5th Cir. 2004).

Congregate inmate worship services, without a free world volunteer, is a benefit that is not otherwise available to members of any faith sub-group. The consent decree governing Muslims is not for a sub-group, but is for all members of the major Muslim faith group. The consent decree in *Brown v. Beto*, 4:74-CV-0069 (S.D.Tex.1977), allows Muslims to meet without a free world volunteer but they must meet with other members of their faith group and are not provided separate services for sub-groups such as Sunni, Shi-ite, and NOI, despite the theological differences between these sub-groups. Further, the inmate coordinators who lead the services are interviewed by Muslim Chaplains to determine the sufficiency of their knowledge base and are instructed how to lead a service properly. Moreover, the Muslim Chaplains resolve complaints about the way the inmate coordinators conduct the services and resolve disputes among inmates about those services.

10. There is no dispute as to the uniformity of implementation of TDCJ policy requiring the presence of an outside volunteer. Neither plaintiff nor prison officials know of any outside volunteer qualified to conduct services or meetings for members of the House of Yahweh or qualified to interview inmates regarding their ability to lead a service.

As in *Adkins v. Kaspar,* 393 F.3d 559, (5th Cir. 2004), it is not the policy which imposes a burden on plaintiff Inzunza's religious practice but, instead, the lack of qualified volunteers. *Accord*, *Mayfield v. Texas Dept. of Criminal Justice*, 529 F.3d 599, 614 (5th Cir. 2008); *Merced v. Kasson*, 577 F.3d 578, 589-591 (5th Cir. 2009)(analyzing 5th Circuit precedent and utilizing RLUIPA and RFRA to construe TRFRA). The Court recognizes that in, *Sossamon v. Lone Star State of Texas*, 560 F.3d 316 (5th Cir. 2009), the Fifth Circuit noted, "It is <u>primarily</u> cases in which the small number of available lay volunteers makes religious services less frequent than an adherent would like (but still available on a somewhat regular basis) that a neutrally applied policy does not substantially burden religious exercise [emphasis added]." Thus, the complete denial of a practice, whether by regulation or by the effect of its operation, is usually construed to be a substantial burden on religious exercise.

The Court does not, however, reach the issue of whether there is a complete denial. Based on the evidence provided, the Court cannot address the question of whether the absence of an outside volunteer constitutes a substantial burden because plaintiff did not meet his burden to show outside volunteers are unavailable. While there is evidence that no outside House of Yahweh volunteers are <u>known of,</u> plaintiff has not attempted to locate any free world House of Yahweh follower to conduct services for House of Yahweh inmates. Until plaintiff produces evidence that he has in good faith, attempted to find a free world volunteer to lead religious services of the faith plaintiff has chosen, and that his efforts have been unsuccessful, the issue is not ripe and no burden shifts to TDCJ to locate free world volunteers or to accommodate plaintiff.

### COMPELLING GOVERNMENTAL INTEREST

11. Even assuming, for purposes of argument, that plaintiff has met his burden regarding both exclusivity and the absence of outside volunteers, plaintiff does not prevail. Instead, the facts

would be similar to *Mayfield v. Texas Dept. of Criminal Justice*, 529 F.3d 599 (5ᵗʰ Cir. 2008), where TDCJ's outside volunteer policy was determined, at least at the summary judgment stage, to impose a substantial burden on the practice of plaintiff's religion.

12.     Stated differently, if the existing weekly study with other Christian non-Roman Catholic Sabbatarians and the informal prayer and discussion sessions with other House of Yahweh inmates in the dayroom or recreation yard are not sufficient, and no outside volunteer is available for House of Yahweh services, plaintiff could be considered to have shown a religious exercise which is "substantially burdened," *see, e.g., Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 323-333 (5ᵗʰ Cir. 2009); *Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 988 (8th Cir.2004) ("[A] substantial burden to free exercise rights may exist when a prisoner's sole opportunity for group worship arises under the guidance of someone whose beliefs are significantly different from his own." (internal quotation marks omitted)), *contra, Jones v. Shabazz*, 352 F3d.Appx. 910, No. 08-20697, 2009 WL 3682569 (5ᵗʰ Cir. Nov. 5, 2009)(inmate's self-serving affidavit that his religious beliefs as member of NOI forbade his consumption of anything but fresh fruits, vegetables, chicken and fish was insufficient to support claim for violation of rights under RLUIPA or First Amendment); *Barnes v. Pierce*, 338 Fed. Appx 373, No. 08-40620, 2009 WL 2029867 (5ᵗʰ Cir. July 10, 2009)(appellant waived review of district court's determination that Taleem was merely a study group and deprivation of Taleem was not a substantial burden on religious exercise in light of inmate's ability to study alone in his cell).

13.     If plaintiff has shown a substantial burden, then TDCJ must show whether it has a compelling interest in not providing the services plaintiff requests.  RLUIPA does not elevate accommodations of religious observances over the prison's need to maintain order and safety. *Cutter v. Wilkinson*, 544 U.S. 709, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005).  In determining whether a compelling government interest exists to support a regulation substantially burdening an inmate's free exercise of religion, the review must be made with due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security, and discipline, consistent with the consideration of costs and limited

resources.  *Baranowski v. Hart*, 486 F.3d 112 (5th Cir. 2007).  RLUIPA is not meant to elevate accommodation of religious observances over a prison's institutional need to maintain good order, security, and discipline or to control costs.  *Id*.

14.    Even if TDCJ's outside volunteer policy, and not the absence of suitable outside volunteers, substantially burdens plaintiff's religious exercise, the Court finds that TDCJ's policy of offering generic services for the major faith groups is the least restrictive means to satisfy its compelling governmental interests in security, safety, space, and staffing, as well as its budgetary concerns.

TDCJ currently has over 250 designated faith preferences.  TDCJ has limited security personnel to supervise these groups.  TDCJ has limited space and time in which to hold meetings for all these faith groups.

Additionally and critically, without an outside volunteer to conduct meetings or services, TDCJ has no way to ensure the conduct of services and the teaching offered in meetings of this faith sub-group are in conformance with free world standards.  If required to allow an inmate to conduct meetings or services for the House of Yahweh inmates, TDCJ officials at the Clements Unit would be forced to grant one inmate religious authority over other inmates.  Any practice of allowing one inmate authority over other inmates is not permitted by TDCJ, and any injunctive relief requiring such would severely compromise TDCJ discipline, security, and order.

15.    It is neither reasonable nor rational to require TDCJ to apportion additional space and personnel to accommodate a faith sub-group which comprises less than one-half of 1% of the unit's population and which is only one of at least 250 faith preferences.  Prison officials in this case have reasonably described that scenario as a "logistical nightmare."  Such a requirement would subvert the operation of the prison system and transform reasonable opportunities for religious observance into a religious smorgasbord for the dilettante or the cynically manipulative inmate to use religion for collateral gain.  RLUIPA was not intended and does not require prisons to satisfy either of these objectives.

16.     TDCJ has a compelling governmental interest in not permitting exclusive inmate-led services for each faith sub-group. TDCJ's policy of allowing generic services, individual study, ministerial visits, and informal group study is the least restrictive means of furthering TDCJ's compelling governmental interest.

Consequently, plaintiff has failed, under any theory, to show a violation of the Religious Land Use and Institutionalized Persons Act.

### FIRST AMENDMENT

17.     Plaintiff's First Amendment claim is analyzed under *Turner v. Safley*, 482 U.S. 78, 89 (1987). The *Turner* standard includes a neutrality requirement-"the government objective must be a legitimate and neutral one ... [and] [w]e have found it important to inquire whether prison regulations restricting inmates' First Amendment rights operated in a neutral fashion." Requiring neutrality ensures that the prison's application of its policy is actually based on the justifications it purports, and not something more nefarious. Ignoring *Turner's* neutrality requirement would allow prison regulators to justify a policy based on a legitimate interest applicable to the overall prison population, while applying the policy in an arbitrary or discriminatory manner in violation of a particular sub-group's First Amendment rights. *Mayfield v. Texas Dept. of Criminal Justice*, 529 F.3d 599, 607-08 (5th Cir. 2008) (citations omitted).

18.     The Court finds that Plaintiff has not shown a violation of the First Amendment. The Fifth Circuit has held that "TDCJ's policy satisfies *Turner* and passes constitutional muster" and is "rationally related to legitimate government objectives." *Freeman v. Texas Dept. of Criminal Justice,* 369 F.3d 854, 860-861 (5th Cir. 2004). The Fifth Circuit has repeatedly concluded that TDCJ's religious accommodation policy "is neutral--it 'operate[s] ... without regard to the content of the expression.'" *Adkins v. Kaspar,* 393 F.3d 559, 571 (5th Cir. 2004) (quoting *Turner*, 482 U.S. at 90). "The pertinent question is not whether the inmates have been denied specific religious accommodations, but whether, more broadly, the prison affords the inmates opportunities to exercise their faith." *Freeman,* 369 F.3d at 861. Plaintiff has been provided with an opportunity to worship every Saturday in the Chapel and worship with others of his faith, though not exclusively with them.

Further, plaintiff may meet with other House of Yahweh inmates in the dayroom and in the rec yard, where they may pray or discuss their religion, though not with their Bibles. In addition, plaintiff receives religious literature and studies and prays in his cell. Although plaintiff may be denied a specific accommodation of meeting exclusively with all of the few members of his specific faith, approximately 0.4% of the offender population at the Clements Unit, but that does not state a violation of the First Amendment.

19.    The Court additionally finds that allowing plaintiff Inzunza to meet with only members of his specific faith group would "have a significant 'ripple effect' on fellow inmates" and on prison staff, and therefore this Court should be particularly deferential to the informed discretion of corrections officials. *Adkins,* 393 F.3d at 565, citing *Freeman,* 369 F.3d at 862, and *Turner,* 482 U.S. at 90. This "ripple effect" would not be confined to the additional personnel required to handle the lay-ins and monitor and record the meetings of members of the House of Yahweh. Requiring the Defendants to allow Plaintiff to meet only with members of his own faith group, regardless of the availability of volunteers, space, or time, could "spawn a cottage industry of litigation and could have a negative impact on prison staff, inmates and prison resources.'" *Id.* Given the ever-expanding number of faith groups and sub-groups and their expanding demands for services directed only to specific faith sub-groups, this would impose on TDCJ additional administrative costs, take staff away from other postings in the prison, and reduce the number of services available for major faith groups.

**EQUAL PROTECTION**

20.    To maintain an equal protection claim, Inzunza must allege and prove that he received

treatment different from that received by similarly situated individuals and that the unequal

treatment stemmed from a discriminatory intent. *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S.

342, 439 (1985); see also *Muhammad v. Lynaugh,* 966 F.2d 901, 903 (5th Cir. 1992)*(*quoting

*McCleskey v. Kemp*, 481 U.S. 279 (1987)). The equal protection clause "directs that all persons

similarly circumstanced shall be treated alike; it does not require classes of people different in fact

or opinion to be treated in law as though they were the same." *Cunningham v. Beavers*, 858 F.2d 269, 272 (5th Cir. 1988), *citing Plyler v. Doe*, 457 U.S. 202, 216 (1982). In order to prove a cause of action, Inzunza must prove that a Defendant acted with a discriminatory purpose. *Woods v. Dunn*, 51 F.3d 577, 580 (5th Cir. 1995). "Discriminatory purpose" occurs when the decision maker chose a particular course of action "at least in part because of, and not simply in spite of, the adverse impact it would have on an identifiable group." *Id.* Prison officials are not required to allocate their resources equally among all religious groups within the prison system regardless of the size of each sect." *Ganther v. Ingle*, 75 F.3d 207, 211 (5th Cir. 1996). "A special chapel or place of worship need not be provided for every faith regardless of size; nor must a chaplain, priest, or minister be provided without regard to the extent of the demand." *Cruz*, 405 U.S. 319, 322 n.2 (1972); *see Freeman v. Texas Dept. Of Criminal Justice*, 369 F.3d 854, 862-63 (5th Cir. 2004) (finding TDCJ's regulations neutral). "The Fourteenth Amendment does not demand 'that every religious sect or group within a prison--however few in numbers--must have identical facilities or personnel." *Baranowski v. Hart*, 486 F.3d 112, 123 (5th Cir. 2007), citing *Freeman*, 369 F.3d at 862-63 (quoting *Cruz v. Beto*, 405 U.S. 319, 322 n. 2 (1972)).

21.     Plaintiff has not shown a violation of the Equal Protection Clause. Muslim offenders are not given separate services for each different group and/or sub-group. All Muslims must meet together. Similarly, Christian/non-Roman Catholic offenders are required to meet together for religious services, and are not allowed to have separate services for each faith group. Because Saturday Christian/non-Roman Catholic services are provided on a weekly basis, Plaintiff has not shown a violation of the Equal Protection Clause.

22.     The Court also finds that Plaintiff has not shown an equal protection violation because he is not similarly situated to the Muslim offenders. The House of Yahweh account for only .04% of the total offender population. Additionally, as the Fifth Circuit has consistently noted, Muslim services are conducted under a consent decree, and not due to any discriminatory intent on the part of TDCJ. *Adkins v. Kaspar*, 393 F.3d 559, 571 (5th Cir. 2004).

Any conclusion of law which should more appropriately be considered a finding of fact, or any finding of fact which should more appropriately be considered a conclusion of law, is hereby deemed as such.

## CONCLUSION

Granting the relief requested by plaintiff would require TDCJ to abandon the outside volunteer requirement, to provide separate services for faith sub-groups, assign security personnel and provide recording equipment for monitoring inmate-led services, assign additional personnel to compile lay-ins, verify lay-ins, and monitor inmate usage of the lay-in passes issued, and select an inmate to lead services without knowing whether the inmate was qualified or the services were conducted in accordance with such services in the free world.  Further, TDCJ would have to adapt existing measures to control gang infiltration at the inmate-led services, and all of which still leave TDCJ with no way to resolve conflict, whether based on theological interpretations or a clash of personalities, that inevitably would arise.  All of this would adversely impact institutional ability to maintain good order, security, and discipline and to control costs *Baranowski v. Hart*, 486 F.3d 112 (5th Cir. 2007)(RLUIPA is not meant to elevate accommodation of religious observances over a prison's institutional need to maintain good order, security, and discipline or to control costs).

In light of the preceding findings of fact and conclusions of law, it is hereby ORDERED that Plaintiff take nothing and that judgment be entered in favor of the Defendants.  It is further ORDERED that any motions not previously ruled upon by the Court are hereby DENIED.

IT IS SO ORDERED.

ENTERED this 31st day of March, 2011.


_____
CLINTON E. AVERITTE
UNITED STATES MAGISTRATE JUDGE